---

**Page 1**

```
         IN THE UNITED STATES DISTRICT COURT
       FOR THE WESTERN DISTRICT OF PENNSYLVANIA

                       - - - -

ROBERT L. RUCKER,                )
                                 )
         Plaintiff,              )
                                 )
         -vs-                    )
                                 )
CITY OF PITTSBURGH, TIMOTHY      )  Civil
MATSON, individually and, in     )  Action
his official capacity, LEROY     )  No.
HAMMOND-SHROCK, individually     )  08-1213
and in his official capacity,    )
OFFICER JOHN DOE, (unidentified  )
in name and number),             )
individually                     )
and in his official capacity,    )
                                 )
         Defendants.             )

                       - - - -

         DEPOSITION OF:  DAVID WRIGHT

                       - - - -

    DATE:     November 6, 2009
              Friday, 9:38 a.m.

    LOCATION: City of Pittsburgh
              Department of Law
              Room 313 City-County Bldg.
              414 Grant Street
              Pittsburgh, PA  15219-2453

    TAKEN BY: Plaintiff

    REPORTED BY: Beth E. Welsh
                 Notary Public
                 QCR Reference No. BW2046
```

---

**Page 2**

DEPOSITION OF DAVID WRIGHT, a witness, called by the Plaintiff for examination, in accordance with the Federal Rules of Civil Procedure, taken by and before Beth E. Welsh, a Court Reporter and Notary Public in and for the Commonwealth of Pennsylvania, at the offices of Michael E. Kennedy, Esquire, City of Pittsburgh Department of Law, Room 313 City-County Building, 414 Grant Street, Pittsburgh, Pennsylvania, on Friday, November 6, 2009, commencing at 9:38 a.m.

                       - - - -

APPEARANCES:

  FOR THE PLAINTIFF:

  Kelly S. Graham, Esquire
  SCANLON & SANSONE
  2300 Lawyers Building
  428 Forbes Avenue
  Pittsburgh, PA  15219
  412.281.9194

  FOR THE DEFENDANT CITY OF PITTSBURGH:

  Michael E. Kennedy, Esquire
  City of Pittsburgh Department of Law
  Room 313 City-County Building
  414 Grant Street
  Pittsburgh, PA  15219-2453
  412.255.2677

  FOR THE DEFENDANTS TIMOTHY MATSON, individually and, in his official capacity, LEROY HAMMOND-SCHROCK, individually and in his official capacity, OFFICER JOHN DOE, (unidentified in name and number), individually and in his official capacity:

  Bryan Campbell, Esquire
  2330 Grant Building
  330 Grant Street
  Pittsburgh, PA  15219
  412.642.7667

---

**Page 3**

                    * I N D E X *

Examination by Ms. Graham . . . . . . . . . .  4
Certificate of Court Reporter . . . . . . . .  94
Errata Sheet  . . . . . . . . . . . . . . . .  95
Notice of Non-Waiver of Signature . . . . . .  96

                * INDEX OF EXHIBITS *

Deposition Exhibit 1  . . . . . . . . . . . .  82
Deposition Exhibit 2  . . . . . . . . . . . .  82
Deposition Exhibit 3  . . . . . . . . . . . .  82

---

**Page 4**

                     DAVID WRIGHT,

               having been duly sworn,

          was examined and testified as follows:

                       - - - -

                      EXAMINATION

                       - - - -

BY MS. GRAHAM:

Q.  Mr. Wright, we just met this morning.  My name is Kelly Graham, and I represent Mr. Rucker in a case against the City and certain individual police officers.  I'm going to be asking you a few questions today.  I understand, based upon your background, that you might have some relevant information about the use of tasers in the City of Pittsburgh Department.

    If at any time you do not understand my question, please let me know, and I'll be happy to rephrase it.  If you answer it, I'll assume you understood it.

    If you need to take a break at any time, let us know that, and we'll be happy to accommodate you, although I don't expect you to be here very long today.

    If you could please give a verbal response to a question so that the court reporter doesn't

Page 33

```
 1      present or --
 2   A. From 2003 to 2007. The taser usage grew
 3      though. 2003 we only had approximately 100
 4      tasers on the street, if that's the year we
 5      initially started, because we bought 100 tasers,
 6      and then as we purchased and officers purchased
 7      more and more tasers, the use of tasers went up
 8      because more officers had them.
 9   Q. In your training with the officers do you
10      distinguish between using the OC spray versus
11      the taser and one's better than the other?
12   A. Yes, ma'am.
13   Q. What do you teach?
14   A. The situation dictates. By and large
15      statistically the taser is more effective.
16      There are going to be times when the taser is
17      not going to be something that you want to use
18      and OC spray would still be your best option.
19   Q. What type of example can you give me where you
20      would not want to use a taser?
21   A. This time of the year perhaps, as we're moving
22      into our winter season, people are going to be
23      heavily clothed, and the taser won't be as
24      effective because clothes act as insulation and
25      so they won't feel the effects of a taser, so
```

Page 34

```
 1      perhaps OC spray would be a better option if
 2      somebody's dressed with thick clothing. If
 3      they're around combustible material you want to
 4      avoid the taser because the electrical discharge
 5      could possible set off -- create a fire or
 6      explosion. So if I'm around gas, for example,
 7      I'll use my pepper spray versus the taser. So
 8      the environment may dictate, the situation may
 9      dictate.
10   Q. Explain to me, in your words, since you are the
11      lead instructor when the use of a taser is
12      appropriate. What level of force does that fit
13      in with the City of Pittsburgh's policies?
14   A. It's a restraint control device, and the use of
15      the taser is going to be very much incident
16      specific. It's going to be based on the
17      resistance being received.
18   Q. What level of resistance does an officer need to
19      see in order to deploy that taser?
20   A. Generally it's going to be -- and this is a
21      general statement, but anything above passive
22      resistance. In other words, defensive
23      resistance, active resistance, assaultive
24      resistance on up. But, again, that's a very
25      general thing for me to say because there's a
```

Page 35

```
 1      lot of other factors you have to take into
 2      consideration.
 3   Q. You mentioned a couple different resistance,
 4      passive, defensive, active, and you said
 5      something else.
 6   A. Assaultive.
 7   Q. Assaultive, okay. What is the distinction
 8      between passive and defensive in your mind?
 9   A. A passive resister -- the most common passive
10      resister would be a protester of some sort
11      perhaps at an abortion clinic, maybe at a
12      military recruiting center where they just sit
13      down. When we use force we generally use it for
14      defense or control. We need to somehow control
15      this individual to move them along, and they're
16      not doing anything other than just sitting there
17      using dead weight. That's a passive resister,
18      somebody that's just -- if you wanted me to get
19      up off this chair and I said, basically, no and
20      I just sat here, this would be a passive
21      resistance.
22   Q. But you'd have to be picked up out of the
23      chair.
24   A. I'd have to be picked up, or you'd have to use
25      some sort of come-along hold, pressure point
```

Page 36

```
 1      that develops some pain to make me want to move,
 2      something along those lines.
 3   Q. In that type of scenario would you recommending
 4      that a taser gun be deployed?
 5   A. For a passive resister using dead weight only we
 6      generally teach do not use the taser or pepper
 7      spray there.
 8   Q. Okay.
 9   A. At first.
10   Q. I'm sorry?
11   A. At first.
12   Q. Okay.
13   A. We'd start at come-alongs, pressure points,
14      things of that nature.
15   Q. You also mentioned defensive resister. What
16      does that mean?
17   A. Well, now say you want me to move and I start
18      grabbing onto this chair, start holding onto the
19      table, I start grabbing things, that would be a
20      form of defensive or active resistance even.
21      You come at me, you put hands on me, I kind of
22      shove you. I don't punch you, I'm not trying to
23      hurt you, but you're going to need force on me,
24      not necessarily for self defense purposes, but
25      for control purposes. So you're going to have
```

37

1  to use force on me for control to effect an
2  arrest, but I'm not trying to hurt you, I'm
3  just -- you know, I'm grabbing on -- I'm holding
4  on to something and you're not going to --
5  you're going to have to do something to get me
6  to move along other than just pick me up.
7  Q.  Okay.  In that type of scenario where you have a
8  defensive resister, the way you've described it
9  for this situation, what is it that you teach
10  your officers, what steps they should do?
11 A.  Well, we teach them a variety of options.  At
12  that level -- again, you have to look at the
13  actor, you have to look at all kinds of things,
14  what's the best options based on the resistance
15  being received there.  So you would have at your
16  disposal for something like that perhaps pepper
17  spray, perhaps the taser, perhaps the use of
18  physical control.  You may have to come in -- if
19  I'm holding onto a chair, like the railing of a
20  chair real hard, you might have to come down and
21  punch my radial nerve to create pain to get me
22  to let go of it, you might want to come down
23  with a taser, use a taser on me to get me to let
24  go of it.  So you have options, the police
25  officers have specific options, and those

38

1  options are based on what would work best.
2  Q.  Okay.
3  A.  Obviously, keeping in line the rules and the
4  laws that govern us as police officers too.
5  Q.  But in that circumstance where you have someone
6  not attempting to hurt the officer, but holding
7  on and not moving freely, you would teach that
8  the use of a taser is appropriate?
9  A.  It's possibly appropriate.
10 Q.  When you say possibly appropriate, what are the
11  officers being taught?  Are they allowed to use
12  their discretion, is it basically, if you have
13  this type of resistance, you have all these
14  options available to you, pepper spray, taser
15  and even physical.
16 A.  (Witness nodding head up and down.)
17 Q.  You have to answer verbally for her.  Is that a
18  yes or a no?
19 A.  I didn't know you were done.  I thought you were
20  still talking.
21 Q.  Well, I'm going to do it piece by piece so that
22  we -- I don't want to misunderstand you or say
23  something you didn't say.  If you have a
24  situation where you have a defensive resister,
25  as you've described it, let's use your example,

39

1  and I said in that circumstance would you teach
2  your officers that it's appropriate to use the
3  taser, and you said it is possibly appropriate.
4  So I'm trying to understand where the line is
5  for them.  What are they being taught, or are
6  they being said you need to use your own
7  discretion?
8  A.  You have to give me more.  Is it an 80-year-old
9  lady holding on to it?  Is it a young man
10  holding on to it?  Is it a sizable man holding
11  on to it?  My force options will change based on
12  the subject factors, the officer factors.
13 Q.  Okay.
14 A.  And they are taught discretion.  A police
15  officer can't be handcuffed on it, this has to
16  be this way.  We have to look at specifics of
17  that incident.  So, you know, they're taught
18  force options, and they learn best techniques
19  through training, through experience, through
20  education.  So I just can't blindly say this is
21  a taser in this case, this is a hands-on in this
22  case.  There's a lot of other factors you have
23  to take into account.  You know, if I have an
24  older, elderly person, I might go for a
25  come-along hold, I might come and just try to

40

1  pull them out.  If I have somebody younger and
2  in shape, you know, I might have to go with a
3  strike.  If I have somebody where I don't think
4  a strike is going to be very effective, you
5  know, the body language, that's another form of
6  resistance we haven't talked about, body
7  language, that tells you a lot.  If I'm sitting
8  here and I'm staring at you, I'm giving you this
9  look, you know, it kind of tells you maybe I'm
10  going to assault you, it's reasonable to assume,
11  you know, the eyes and my body language, the
12  intensity, you know, I might say to myself I'm
13  not going to touch this individual because if I
14  go close to this person, an assault is imminent,
15  so I'm going to use my taser because I can end
16  this safely and legally through distance.  So
17  the taser may be applicable sometimes, and
18  sometimes, you know, it might be more applicable
19  to go hands-on.  You have to look at the
20  specifics.  So I can't just generally say taser,
21  hands, I have to look at, you know, a specific
22  incident and say, okay, this would have been a
23  good time for the taser.
24 Q.  Does the City of Pittsburgh have a force of
25  continuum?

### Page 45

1  taser one time, and that was on a dog.
2  Q. In intermediate force you mentioned the baton,
3     are there other weapons that the officers can
4     carry besides the baton that would fit into that
5     category?
6  A. Impact weapons would be -- instead of using the
7     term batons, I would just say impact weapons, so
8     it would be a flashlight perhaps, a blackjack,
9     the use of a radio, environmental impact
10    weapons, officers have had to use -- I've read
11    reports where officers have had to use toilet
12    seats as impact weapons.
13 Q. Okay. As part of your responsibilities in
14    reviewing these use of force reports, have you
15    ever investigated or looked into a use of force
16    report that was not red flagged? In other
17    words, it's in your stack, and you're going
18    through it and something in your mind seems not
19    right, have you ever had occasion to have that
20    happen?
21 A. Yes, ma'am.
22 Q. Can you give me any idea of how often that might
23    have happened in your career?
24 A. I'd say a couple times a year I'll be reading a
25    report, I'll read a report and I'll have to --

### Page 46

1  you know, not just taser related, but just
2  officer safety related where, you know, the
3  officer maybe should have done this or done this
4  and it really affected their safety, or maybe it
5  was a force issue. I'll make my supervisors
6  aware of it, and what they'll do is we'll
7  address it and we'll retrain them.
8  Q. When you say use of force issue, that's a
9     circumstance where you may have thought the
10    officer did not use the appropriate level of
11    force?
12 A. Oftentimes they don't use enough force.
13 Q. Okay. In your role have you ever found that an
14    officer actually used too much force?
15 A. I would have to go back and look at all of my
16    reports and everything, but yes, yes, I have.
17 Q. Do you have any idea how many times you've
18    actually determined that an officer might have
19    used too much force in a situation?
20 A. No, I don't have a number on it. I can tell you
21    it's not often. Truthfully, the reports I read,
22    the reports reveal that officers by and large
23    don't use enough force. Let me rephrase that.
24    For the vast majority they're right on the
25    number, but when an officer seems to error one

### Page 47

1     way or the other, it puts their safety at risk,
2     they don't use enough force. They're legally
3     allowed to use this amount and they don't.
4  Q. Did you provide any input based upon your
5     certifications and the training you had into the
6     City of Pittsburgh's taser use policy?
7  A. Yes, ma'am.
8  Q. What input did you provide, what was your role?
9  A. I provided a fair amount of input in terms of
10    getting other department's policies, looking at
11    best practices across the country, looking at
12    policies that Taser could compile for me, some
13    of their recommendations, also -- not just
14    Taser, we looked at Stinger, which is their
15    competitor, we looked at some of their
16    recommendations. We look at also things that
17    are going on, trends that -- for example,
18    cuffing under power. The policy is made up of a
19    lot of best practices through departments and
20    through manufacturers across the country, and a
21    lot of that was compiled by me.
22 Q. Okay. Am I correct that the City of
23    Pittsburgh's use of force policy related to
24    tasers would -- obviously it would fall under
25    the restraint and control section of the --

### Page 48

1  A. Yes, ma'am.
2  Q. -- continuum? Okay. I guess where I'm -- and
3     it's probably me being confused, but where I
4     have a question is once an officer -- they're on
5     the scene, if verbal direction is possible and
6     they try it and it's not working, when they get
7     to that third level, do the officers have the
8     discretion to use any of the -- let's take
9     canine out of it in case they would have to be
10    called, six different types of deployments, can
11    they use any of those -- once they hit that
12    level, are they free to use any one of those?
13 A. Based on the resistance being received.
14 Q. Okay.
15 A. Again, you have to look at, you know, as I was
16    talking earlier, you know, a lot of other
17    factors, officer/subject factors, prior
18    knowledge. If I come across somebody and I have
19    prior knowledge and he's maybe let's say 5'5 and
20    140 pounds and he's giving me this, on the
21    surface that doesn't appear, but I have prior
22    knowledge, hey, this guy is a professional
23    boxer, it's going to change how I do business.
24    Age plays a factor. As I mentioned, the
25    80-year-old lady versus somebody that's younger,

**Page 49**

a male, stronger, that's going to play a
difference. But they have to look at that. And
they've been -- you know, they're taught
reasonable force, reasonable force, we hit that
point in our training, and they have to use
their education, their knowledge, their training
to pick the most reasonable force option out of
restraint and control.

Q. Okay.

A. There's no black and white to use of force. You
know, you have to pick what's reasonable based
on the scenario.

Q. I understand that I think, I'm just trying to
understand from the prospective of what these
officers are being taught, and I understand
obviously, I'm sure you're teaching them use
your best judgment in every situation.

A. We teach them Graham vs. Connor, we teach them
about policies, we teach them the federal
guidelines, we teach them the state laws, we
teach them about policies and we teach them how
to be trained on specific tactics too, and then
with that they take all that knowledge and they
go out in the street and they make the decision.

Q. Okay. And I guess where I'm trying to -- and

**Page 50**

you may not be able to give me an answer to my
specific question, but what I'm trying to
understand is based upon looking at policies and
some of the other testimony that I've had, when
you get to the point where you need to use some
form of restraint and control, are the officers
allowed to use their discretion as to which they
pick? Even if it's not what you would have
picked, are they still completely okay if they
pick any of the six regardless of whether or not
you felt they should have picked the six or,
when they're in this category of restraint and
control, are they still supposed to try the
come-along first or try the pressure points or
try the OC spray, or can they just walk in and
say I told you to stop doing it, you're not
doing it, boom, here's the taser?

A. They're taught to use the best option based on
the resistance being received. So they're not
taught like a ladder, you have to go boom, boom,
boom, boom, absolutely not. In fact, they're
not even taught -- they might have to -- all of
a sudden they might come into it and, you know,
they have that knowledge, we have that boxer
again, all of a sudden the fists come up and, to

**Page 51**

be honest with you, I have a professional boxer
coming at me with fists, I'm drawing my firearm
and getting behind the car. I'm not going to
take a punch to the face with a professional
boxer.

Q. Okay. When you're teaching them the constraint
and control, let's take immediate and deadly
force out of the picture, that's not in our
scenario for this question, when you're teaching
them the restraint and control, as I understand
then, you do not teach them to try this method
before you try this method, there's no basic
order?

A. Sometimes we do, sometimes we don't.

Q. What do you mean sometimes you do, sometimes you
don't?

A. Let's say we have that 60 or 80-year-old lady.
    MR. CAMPBELL: She's getting younger.
BY MS. GRAHAM:

Q. I'm trying to think am I going to be safe at
some point.

A. Let's say we have that 80-year-old lady and you
try the come-along hold and it doesn't work,
then you might have to systemically go up that
ladder so to say, but you arrived there and it's

**Page 52**

reasonable to assume that, hey, you know, based
on the officer/subject factors, even starting at
this lower level -- for example, bring it back
down to that 25-year-old man and he's showing
body language, it would be reasonable to assume
if I go in here hands-on, I'm running the risk
of hurting -- getting myself put into a position
where I might be hurt, where, okay, the law's
allowing me -- because we don't have to use the
least level of force, the law doesn't say that,
we have to use the most reasonable. And that's
why officers don't use enough force because they
get in this mind set we have to use the least or
the minimum amount of force, that's incorrect.
Police officers do not have to use the minimum
amount. We have to use force that's necessary
and reasonable and it's based on the incident,
and Graham vs. Connor, which is the landmark
case in use of force, it makes provisions
saying, hey, this officer might choose this,
this officer might choose this, you might choose
this, you know, because what we perceive and how
we handle things are going to be different, but
they're basically around the same levels. So
what we try to do is these are around the same

61

```
 1     that point.
 2  Q. Okay. Is that something that you would question
 3     an officer about when you're reviewing these
 4     reports?
 5  A. That may be something that I would question an
 6     officer about.
 7  Q. But as I understand, and tell me if I'm wrong
 8     from your earlier testimony, based upon the City
 9     of Pittsburgh's policy, an officer, once they
10     reach that level of resistance -- restraint and
11     control, excuse me, is he within his legal
12     rights to pull the taser on her?
13  A. To pull the taser?
14  Q. To deploy it, I'm sorry.
15  A. (Gesturing.)
16  Q. I'm not trying to trick you, all I'm trying to
17     understand is when they get to this step, can
18     they utilize any of these techniques without
19     there being any Monday morning quarter backing
20     from you or anybody else? If they said, hey, I
21     tried these two things, they didn't work, are
22     all of these options equally available to them
23     under any situation?
24  A. Well, it goes on probability of injury
25     generally. For example, the soft empty hand
```

62

```
 1     control carries with it a lower level of
 2     probability of injury and then as you go down
 3     to -- what's the last one I have on there,
 4     probably hard empty hand control, there's a
 5     higher probability of injury, and then what's in
 6     between it, that's how we try to list the
 7     probability of injury. So is anything on the
 8     table, we're looking at -- we look at, again,
 9     the incident itself. Would that taser be a
10     force option available? Yes, it would be a
11     force option possible to that officer given the
12     circumstances. Is it the best force option?
13     Maybe not.
14  Q. Okay. Injury to whom? You said we look to the
15     injury --
16  A. Both. For example, we teach somebody to punch
17     somebody, we teach them to punch them as hard as
18     we can. Why? Because that makes it safer for
19     the actor, it makes it safer for the officer
20     because if I have to only hit once, I don't have
21     to hit you five, six times, which means I'm not
22     hitting all these different areas, which means
23     maybe I can, you know, end the use of force
24     encounter. The longer the use of force
25     encounter plays out, the higher the potential
```

63

```
 1     for injury for both the officer and the actor.
 2          THE WITNESS: If it's possible, I need
 3     to use the restroom.
 4          MS. GRAHAM: Sure.
 5                 - - - -
 6          (Whereupon, there was a brief pause in
 7     the proceedings.)
 8                 - - - -
 9  BY MS. GRAHAM:
10  Q. Just before the break we were talking about --
11     you mentioned the officers are taught about the
12     level of injury. And using just the restraint
13     and control category, what would the order of
14     level of injury to someone be generally taught?
15     I understand there's going to be exceptions to
16     every rule, but generally what are they taught?
17  A. Generally, the probability of injury. In other
18     words, a soft empty hand, use of a pressure
19     point carries with it a lower probability of
20     injury than, if I would say, use a closed fist
21     punch.
22  Q. Where would OC spray or taser fit into that?
23  A. Generally, it goes at the lower end, there's a
24     lower probability of injury, so you'd have your
25     come-along holds, pressure points, just
```

64

```
 1     underneath that you'd have your taser and pepper
 2     spray, OC/taser because they're considered about
 3     the same.
 4  Q. Are you given any training on the effects of the
 5     taser on the person who's actually -- that it's
 6     been deployed into?
 7  A. Have I been given any training on it?
 8  Q. Yes. What is your understanding as to what
 9     injury, if any, a taser can cause?
10  A. Well, I know firsthand, I've been hit with a
11     taser several times.
12  Q. Are you one of those ones that volunteered to
13     be --
14  A. I've felt the effects of the M26, the X26 and
15     the C2 on more than one occasion, so I've been
16     under the effects of a taser.
17  Q. We'll talk about what happened with your
18     personal experience with the taser, but what
19     training, if any, does the City provide you as
20     to what injury it can cause?
21  A. Well, first, the highest probability for injury
22     with the taser, if you're going to get hurt with
23     the taser, it's going to be the fall because
24     you're incapacitated and you're going to fall to
25     the ground. So it's what we call a secondary --
```

**Page 65**

1  the injury is secondary. It's not the taser,
2  it's the fall.
3  Q. Okay.
4  A. So if injury is going to occur, it's going to be
5     from the fall. There is a potential risk for
6     connective tissue damage perhaps because your
7     muscles contract. I always say it's like a
8     really hard workout and then some because your
9     muscles are contracting. When you get the taser
10    deployed on you, the greater the spread, the
11    greater the effectiveness. In other words, if
12    the taser is deployed here and it's deployed
13    here (indicating), my muscles throughout my
14    whole body are going to be contracting hard. If
15    it's more like in the leg, then it's going to be
16    central to that leg itself. So you're looking
17    at possible, you know, connective tissue
18    injury. So there's some injury potential
19    perhaps, you know, if you hit a sensitive area.
20    For example, a taser probe is deployed and it
21    goes into the eye, obviously you're looking at
22    potential injury there too. So in regards to
23    injury potential, it's addressed.
24 Q. Are the officers taught where they should deploy
25    the taser, is there a --

**Page 66**

1  A. We do teach them preferred areas.
2  Q. What are the preferred areas?
3  A. Well, you know, and they're not always
4     possible. Preferred areas are going to be --
5     the most preferred area, but an area that is
6     hard to access oftentimes, is the back.
7  Q. Why would the back be one of the preferred
8     areas?
9  A. Less likelihood of a sensitive area being hit
10    with the taser.
11 Q. Okay.
12 A. And also the back itself carries with it a lot
13    of muscle mass, and you're not going to find --
14    bodies don't retain a lot of fat in the back, so
15    we can access the muscle. Because fat in itself
16    acts as an insulator. If you strike somebody in
17    the abdomen and they have a big belly, the
18    current needs to go through the belly, it's
19    going to give you less effect perhaps. So on
20    obese people the taser is not going to be as
21    effective.
22 Q. Okay. Any other preferred areas besides the
23    back that they're taught, that you teach?
24 A. Sure, we teach the best case scenario, you know,
25    you're trying to increase the belt line so that

**Page 67**

1  you can get the legs and the upper body and the
2  lower body affected so that you can incapacitate
3  the entire body for that five seconds.
4  Q. So if I understood your answer, you teach them,
5     if possible, to try to shoot so that the belt
6     would be -- the one taser would go above it and
7     one would go below it?
8  A. Yes, and we also teach -- well, that's one of
9     the options, of course, if you're facing
10    somebody frontal, you know, then we would teach
11    kind of a torso shot.
12 Q. Is there a reason for the torso?
13 A. Again, we try to get the upper body and the
14    lower body effect. The preferred range, the
15    optimal range seven to fifteen feet and that's
16    so that we can get the entire body effect. The
17    greater the spread, the greater the
18    effectiveness. That's not always possible.
19 Q. Do you teach the officers acceptable ranges to
20    use the taser as of you can't be too far away,
21    you can't be too close, are there any guidelines
22    for that taught to the officers?
23 A. We teach them preferred, seven to fifteen feet
24    is the optimal range, because at this range you
25    have the best of both worlds, you're going to be

**Page 68**

1  accurate and you're getting a nice spread.
2  There are going to be times though we teach
3  where we can deploy that taser -- I tell them
4  get a frog's hair away. I don't know how big a
5  frog hair is, but I imagine it's pretty short.
6  In other words, I can press that taser right up
7  on the arm and deploy it, you may have to do
8  that, close quarter combat, close quarter
9  fighting, close quarter defense. The
10 distance -- you know, now, I tell people if you
11 start getting 21, 25 feet out, odds are you're
12 going to miss them. It's more of an issue of
13 missing. And as you move in closer, my spread
14 gets diminished so the taser won't be as
15 effective. So if I'm right on top of you or
16 you're on top of me and I use it in defense and
17 I just get the probes right here (indicating),
18 it's really going to be really just a pain
19 compliance affecting that radial nerve in the
20 forearm area, and I still have my entire body to
21 fight you with. We like that seven to fifteen
22 feet. As you move in closer the spread is less,
23 so the possibility for it not being as effective
24 is there. As you move out further the
25 probability for missing is greater.

77

1  A. Yes.
2  Q. And those reports, we can agree, they don't have
3     any details in them, I think they just check
4     numbers, what type of an arrest was made and
5     then they give you the order of force that they
6     use?
7  A. They give you the order of force, they give you
8     the order of resistance, they give you any
9     injury information to both the actor and the
10    officer, the back page of it would.
11 Q. Okay. In that situation is that officer
12    required to give you any narrative describing
13    the situation or you're just going off those
14    boxes that are checked and the numbers that are
15    given to you?
16 A. I'm going off all the reports of the incident.
17 Q. So when you get the subject resistance report
18    you also get, along with it, the arrest report
19    and the investigative report for every --
20 A. I get all the reports that come with it, yes.
21 Q. So do you review every report for every subject
22    resistance you're given?
23 A. Every report.
24 Q. So you would have reviewed these reports back
25    around the time that it happened?

78

1  A. Yes, ma'am.
2  Q. Did you review them again since the lawsuit was
3     filed?
4  A. Yes, ma'am.
5  Q. I'm assuming -- well, let me not assume, back
6     when the incident happened do you actually
7     recall reviewing that report?
8  A. No, ma'am.
9  Q. Would it be fair to say there was nothing about
10    that report that sent up a red flag in your
11    mind?
12 A. No red flag, ma'am.
13 Q. Okay. In reviewing the report again was there
14    anything about the use of force that sent up a
15    red flag?
16 A. No, ma'am.
17 Q. Were you aware that Mr. Rucker has indicated
18    that he did not engage in any type of defensive
19    resistance at the scene?
20 A. No, ma'am, just what the report read.
21 Q. Hypothetically speaking, if Mr. Rucker, who is a
22    male in his twenties was stopped and there were
23    two officers on the scene with him and told him
24    to stay in his vehicle until backup arrived, if
25    they then proceeded to open the door and pull

79

1     Mr. Rucker out of the car and Mr. Rucker was not
2     resisting, defensively, aggressively, he was
3     asking why he was being stopped and pulled out
4     of the car, if a third officer arrived on the
5     scene and tased him as he was being pulled out
6     of the car, is that something that you would
7     want to look into further that would send up a
8     red flag?
9        MR. KENNEDY: I object to the form.
10 BY MS. GRAHAM:
11 A. How was he resisting?
12 Q. He wasn't resisting. He was being pulled out of
13    the car, officers grabbed him by each arm to
14    pull him out of the car.
15       MR. KENNEDY: Same objection.
16 BY MS. GRAHAM:
17 Q. And the third officer tased him as he was being
18    pulled out of the car.
19       MR. KENNEDY: Running objection to
20    form as to any questions requesting his opinion
21    of this matter.
22 BY MS. GRAHAM:
23 A. I would say he was probably resisting because
24    why did they have to pull him out of the car?
25    If they asked him and he didn't come, that's a

80

1     form of resistance in itself.
2  Q. What if they didn't ask him? They opened the
3     door -- once the third officer arrived they
4     opened the door and pulled him out of the car.
5  A. Is there a reason, is there a gun sitting next
6     to him?
7  Q. No, there's no weapon.
8  A. If the individual's just sitting there, for
9     example, if I was just sitting here like this on
10    a traffic stop and all of a sudden the door
11    opened, the police pulled me out of the car and
12    tased me, yes, it would raise a red flag.
13 Q. I'm asking this based upon your experience in
14    teaching this for ten years and your
15    certifications and what you actually teach your
16    officers. Now, obviously the officers testified
17    differently, they testified that he was being,
18    what I would think you would call a defensive
19    resister, that he was holding onto the steering
20    wheel and would not get out of the car. In that
21    situation, if we accept what the officers said
22    was true, and they ordered him to get out of the
23    car and he did not get out of the car, he was
24    asking why are you doing this, why are you
25    trying to get me out of the car and he held onto

**81**

the steering wheel as one of the officers said he did, the third officer, Marabello arrives on the scene and tells everyone to stand back, goes into the car and tases him, do you believe that would have been appropriate use of force under those circumstances?

MR. KENNEDY: If I could stop you a second. Do you want to add what Officer Novac said as well.

MS. GRAHAM: What did --

MR. KENNEDY: About the officer physically attempting to get him out by grabbing him and pulling him.

BY MS. GRAHAM:
Q. Schrock filed a supplemental report after the fact saying he tried a come-along first. That wasn't in the initial report, he filed that a couple days later. He tried a come-along, and that did not work. But Marabello wasn't on the scene for that point, he came as they were trying to get him out of the car. In that situation, he's not threatening them, he's not screaming at them, he's not assaulting them, but he is holding onto the steering wheel according to one of the officer's testimony. Would that

**82**

be appropriate use of force in your mind?
A. Yes.
Q. Okay. In the other scenario that I gave you, which is somewhat different, where he was not resisting in any way and there was no threat to him, but the door was open and the officers, two officers began to escort out and a third officer tased him while he was being escorted out, that is something that would send up a red flag in your mind?
A. Yes, because then there's no resistance, you don't need to use force.

----

(Deposition Exhibit Nos. 1 through 3 were marked for identification.)

----

BY MS. GRAHAM:
Q. Mr. Wright, I'm showing you three different exhibits that have been marked 1, 2 and 3, and these are policies from the City of Pittsburgh, and some of them, I think, we might have referenced during your deposition, so I want to just make sure we were talking about the same policies. The first one is, I believe, the Continuum of Control Policy; is that correct?

**83**

----
(Whereupon, the witness reviewed the document.)
----

BY MS. GRAHAM:
A. Yes, ma'am.
Q. Have you seen this document before?
A. Yes, ma'am.
Q. Is this something that you train your officers on when you receive these updates or reissue dates?
A. On reissue dates they are at the zones, the supervisors go over any changes.
Q. Okay. This particular Continuum of Control Policy which has been effective date of 3-23 of 2007, did you participate or provide any input in your capacity as the lead instructor for this particular policy?
A. Yes, ma'am.
Q. What input did you provide?
A. Specifically, if you go to the last page, Page 3 of 3, you'll see that the circle that's provided there, that was put in there based on my recommendation, and the reason why is because we are trying to get our officers into the mind set

**84**

that you pick the most reasonable force option based on the specific incident that you're dealing with, and we are trying to get away from this ladder mentality where you go step one, two, three, four, we're trying to get away from that. So we felt that this was a better system, this pie graph would be better served. Some agencies have gotten away from -- the Federal Law Enforcement Training Center, FLETC, they've gotten away from training force continuums altogether because they realize Graham vs. Connor changed, you know, the use of force and so now it's very specific, you have to look at that incident. It's easier to teach this method versus the ladder method.
Q. In looking at this chart that's at the bottom of that page, it seems to be on the outside of the five different levels of the continuum of control, is that correct, verbally noncompliant?
A. Yes.
Q. I'm sorry, I misspoke, the ones on the inside are the --
A. Options.
Q. -- options for continuum of control levels; is that correct?

85

```
 1  A.  Yes, ma'am.
 2  Q.  Okay.  And the ones on the outside seem to be
 3      the type of resistance you can encounter?
 4  A.  Yes, ma'am.
 5  Q.  Under passive resistance --
 6  A.  Yes, ma'am.
 7  Q.  -- it seems to be over the heading of verbal
 8      control; is that correct?
 9  A.  It's in the order of verbal control and -- it's
10      hard to see because of the copy, you would have
11      these lines, and these lines come out and you
12      actually would have, you know, passive
13      resistance comes out slightly over here so this
14      graph gives you -- because basically, we want to
15      resolve passive resisters through verbal control
16      and these techniques of communication, but then
17      when that fails, you know, and this is, you
18      know, given -- there's room for this stuff to
19      start coming into play.
20  Q.  Are your officers trained to attempt to not to
21      use the restraint and control if they have a
22      passive resistance, are they basically trained
23      don't go there unless you absolutely have to?
24  A.  We train our officers when dealing with the
25      passive resister to try to use verbal
```

86

```
 1      communication and use your officer presence to
 2      successfully end this problem.
 3  Q.  Are they given any instruction or direction,
 4      whatsoever, as to when you have a passive
 5      resistance, if you need to go into restraint and
 6      control, try this first?
 7  A.  When words fail and you have to go hands-on, we
 8      teach -- for passive resister, and generally,
 9      again, that is body weight, we're just using
10      body weight, then soft empty hand control is
11      going to be your most reasonable force option.
12  Q.  Are they told, basically, to try that first
13      before they resort to the spray or the taser or
14      the empty hand?
15  A.  For a passive resister, yes.
16  Q.  Okay.  This particular chart, is it supposed to
17      be shaded in, is that what you're telling me?
18  A.  Yeah, there's -- it's not the best copy in the
19      world.
20  Q.  Is there an original I could maybe see?  Do you
21      have something that would have the shaded in
22      area a little better that I could look at, at
23      some point?
24           MR. KENNEDY:  Do you want me to grab
25      mine?  I might have a better copy right now.
```

87

```
 1           MS. GRAHAM:  If you do, that would be
 2      great.
 3                  - - - -
 4           (Whereupon, there was a brief pause in
 5      the proceedings, and the witness and Ms. Graham
 6      reviewed the document.)
 7                  - - - -
 8  BY MS. GRAHAM:
 9  Q.  Mr. Wright, looking at -- Mr. Kennedy brought up
10      a little bit of a clearer graph.  On your
11      exhibit, and I realize this is an estimation,
12      can you just draw in there with a line with a
13      pen where you believe the graph, basically,
14      should be on the exhibit copy?
15  A.  I'm not an art major.
16  Q.  It looks like it kind of goes to the V of
17      passive, is that correct, this shaded area
18      (indicating)?
19  A.  Yes (marking document).
20  Q.  And then the shaded area on the opposite side
21      seems to go to about the E.
22  A.  (Marking document.)  You can see restraint and
23      control has a wider range.
24  Q.  Next, Exhibit 2, I think that might be use of
25      force of taser or taser policy, I'm not sure
```

88

```
 1      what order I gave those to you?
 2  A.  The taser policy is Exhibit 2.
 3  Q.  Okay.  In this particular taser policy did
 4      you -- this one has an effective date of 3-10 of
 5      '04.  Do you know if there's a more up-to-date
 6      policy?  It was reissued on 1-3 of '05, so 1-3
 7      of '05 is the latest date we have on here.
 8  A.  I don't know off the top of my head if there's a
 9      more current policy.
10  Q.  Did you participate in any way in providing
11      input into this policy?
12  A.  Yes, ma'am.
13  Q.  What input did you provide?
14  A.  At one point, I actually made this policy and
15      then typed it, I should say.  They gave me the
16      template, I typed it and I sent it on up to -- I
17      want to say at the time either Lieutenant Dixon
18      or Lieutenant Beidle, whoever was responsible
19      for helping to complete this, and I took what I
20      thought was the best policies of the various
21      departments across the country, and I took what
22      I thought was their best practices, and I took
23      into account our policy on use of force, Chapter
24      Five of the Crimes Code, put it altogether, and
25      I put, what I thought was, the best of the best
```

89

1  down and submitted it. Now, I know that
2  Commander McNeilly had a lot of say in helping
3  to design this too, Commander Catherine
4  McNeilly, because, as I recall, she, on Page 4
5  of 6 -- she or her office helped design this
6  taser probe, successfully discharge this little
7  graph you see, her office had a lot to do with
8  developing this. So I'm not the only person
9  that helped design this, there was input. And
10 we did gather input from other departments too.
11 Q. Okay. Under 5.2, this taser policy, it says
12    situations in which the use of taser may be
13    authorized include, but are not limited to, the
14    following, and then it lists four examples. Do
15    you see that?
16 A. Yes, ma'am.
17 Q. Is that information that you provided, or did
18    that come from somebody else?
19 A. I don't know as I sit here and read this.
20 Q. You don't know then why those four particular
21    situations were identified in this policy?
22 A. Let me read it.
23 Q. Sure.
24            - - - -
25       (Whereupon, the witness reviewed the

90

1       document.)
2            - - - -
3  BY MS. GRAHAM:
4  A. What's put in here are good examples of taser
5     usage, cite some examples.
6  Q. But you don't recall if you provided these, so
7     it would be hard for you to say why these four
8     specific examples are listed; is that correct?
9  A. I'm pretty confident that they're listed because
10    they're good examples of possible times to use
11    the taser, I'm pretty comfortable in saying
12    that.
13 Q. Okay. Do you know why only these four types of
14    situations were listed?
15 A. Just examples. These are good -- prevent
16    somebody from hurting themselves, it's a good
17    example, this is something we want to show our
18    officers.
19 Q. Exhibit 3 is the City's Use of Force Policy,
20    reissue date of 1-3 of '05. Do you know if
21    that's the most recent use of force?
22 A. I believe it is.
23 Q. Did you participate in providing any input into
24    this policy?
25 A. I was one of the participants.

91

1  Q. Do you recall what input you provided?
2  A. We had a use of force committee, so a lot of
3     us -- for me to say that this is me, I can't say
4     that. It's a lot of input from a lot of
5     people. That's true pretty much on all our
6     policies, it's not one person, there's a lot of
7     input from a lot of people.
8  Q. In your role do you have any responsibility to
9     review these policies to determine whether or
10    not they should be updated in any way? Like,
11    for example, this policy Exhibit 3 is over four
12    years old, did you play any role in reviewing
13    them or do you know who does review them to
14    determine whether or not the policies should be
15    updated?
16 A. They are reviewed and updated as needed on
17    pretty much, I'll say, an annual basis. All our
18    policies are. I believe Lieutenant Jennifer
19    Beidle handles that. And if it has to do with
20    something that's in my area of expertise, then
21    she calls me and she and I or whoever will go
22    over it. So she's actually a person that I'm in
23    constant contact with with these types of
24    policies, use of force, because she's -- one of
25    her jobs, and I believe it's in the intelligence

92

1     section, that she's handling a lot of these
2     policies and making sure that they're reviewed
3     and updated as needed.
4  Q. So if she felt that the taser policy, which
5     Exhibit 2 is again over four years old, needed
6     to be updated, she would, in all likelihood,
7     contact you since you're one of the
8     instructor -- you're the lead instructor who
9     would be teaching officers about taser use; is
10    that correct?
11 A. Yes, and I believe that no motor -- I believe
12    since the federal consent decree took place back
13    in the late '90s, that was one of the things
14    that -- they have to be reviewed anyway. If
15    they're following this procedure, I believe, and
16    that's why I believe she does do it, and she's
17    been doing it. They're going to be reviewed --
18    I believe they're going to be reviewed no matter
19    what on a certain level. I don't know if it's
20    annual, biannual, I don't know what the time is,
21    but I believe they are reviewed at a certain
22    time regardless.
23 Q. But as far as you can recall sitting here today,
24    you don't recall there being a more recent taser
25    policy than four plus years ago or use of force